UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
UNITED STATES OF AMERICA,                  :
                                           :        **OPINION AND ORDER**
            -against-                      :        09-CR-968 (DLI)
                                           :
BRAD A. RUSSELL, and KRISTOFOR J. LANGE, :
                                           :
                          Defendants.      :
------------------------------------------------------------------x
**DORA L. IRIZARRY, United States District Judge:**

Defendant Brad A. Russell ("Russell") was charged with conspiracy to commit wire fraud in connection with the Harbor Funding Group, Inc. ("HFGI") scheme. (Superseding Indictment ¶¶ 11-12, Docket Entry No. 38.). Russell and Kristofor J. Lange ("Kris Lange," together with Russell, "defendants") were charged with securities fraud and conspiracy to commit securities fraud and wire fraud in connection with the Black Sand Mine, Inc. ("BSMI") scheme. (*Id.* ¶¶ 13-17.) The Court held a six-week jury trial, and, on March 6, 2014, the jury returned a verdict of guilty as to each defendant on all charges. Defendants now move for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure and, alternatively, for a new trial pursuant to Rule 33. The government opposes.

For the reasons set forth below, Russell's motion is denied in its entirety. Kris Lange's motion is granted to the extent that a judgment of acquittal is entered as to the securities fraud substantive count and denied as to the conspiracy count.

## BACKGROUND

### I.        The Superseding Indictment and Trial

On November 21, 2011, a grand jury returned a Superseding Indictment that charged the defendants and others with defrauding investors pursuant to two schemes. Count One charged that, between June 2007 and December 2010, defendant Russell conspired with William C.

Lange ("Bill Lange"),[1] Frank E. Perkins ("Perkins"), Joseph Pascua ("Pascua"), Judith Shulmire ("Shulmire"), and others (collectively, the "HFGI conspirators") to defraud clients of Harbor Funding Group, Inc. through an advance fee scheme. (Superseding Indictment ¶¶ 5, 11-12.) Specifically, the Superseding Indictment charged that the HFGI conspirators offered loans to land developers who had clients looking to build houses in regions affected by Hurricane Katrina. (*Id.* ¶ 5.) The HFGI conspirators allegedly told their clients that: 1) HFGI had funds available to provide financing for the developers' projects in exchange for a fee, payable in advance, of ten percent of the loan amount; 2) the ten percent fee would be placed in an attorney escrow account until the loan closed; and 3) the fee would be refunded if HFGI did not fund the project. (*Id.*) The government alleged that, in fact, HFGI did not have adequate funding to finance the developers' projects, fees placed in escrow almost immediately were transferred into accounts controlled by Bill Lange, and fees were not refunded when HFGI failed to fund its clients' projects. (*Id.* ¶ 6.) As a result of this scheme, the HFGI conspirators collected more than $9 million dollars in advance fee payments, which they used, *inter alia*, to pay HFGI employees' salaries and Bill Lange's personal expenses. (*Id.* ¶ 7.)

Count Two charged that, between December 2009 and January 2011, defendants Russell and Kris Lange conspired with Bill Lange, Perkins, Pascua, Shulmire, and others (collectively, the "BSMI conspirators") to fraudulently induce investors to invest in Black Sand Mine Inc. (*Id.* ¶¶ 8, 13-15.) The Superseding Indictment charged that the BSMI conspirators made false and material misrepresentations to induce investments in BSMI, including, *inter alia*, statements that: 1) BSMI had $850,000 available in total assets; 2) BSMI owned a large stake of a gold mine that was projected to gross $52 million per month in 2011; 3) Pascua had led several companies to

---

[1] Bill Lange is Kris Lange's father and Russell's brother-in-law.

national prominence; 4) concealed Bill Lange's involvement in BSMI; and 5) concealed BSMI conspirators' prior involvement with HFGI. (*Id.* ¶ 9.) The BSMI conspirators allegedly transferred most of the BSMI investors' funds to accounts controlled by Bill Lange and to other BSMI employees. (*Id.* ¶ 10.) Count Three charged the defendants, along with Bill Lange, Perkins, Pascua, Shulmire, and others, with substantive securities fraud arising out of the BSMI scheme. (*Id.* ¶¶ 16-17.)

At trial, the government presented testimony from several victims of the HFGI and BSMI frauds, cooperating witnesses Pascua and Shulmire, Postal Inspector Kenneth Lucente ("Inspector Lucente"), and forensic banking analyst Wendy Spaulding, along with extensive documentary evidence, including numerous emails between and among the coconspirators and with investors. Kris Lange called fact witness Melissa Griffith, his girlfriend and the mother of his children, and Russell called character witness Joan Blalock. After six weeks of trial and two days of deliberation, the jury returned a verdict of guilty as to each defendant on all three charges in the Superseding Indictment. The Court assumes familiarity with the evidence presented at trial and summarizes the relevant evidence as necessary throughout this Opinion and Order.

## II.    Procedural History

At the close of the government's case on February 25, 2014, Kris Lange moved for a judgment of acquittal pursuant to Rule 29(a), claiming the government had failed to establish that venue was appropriate in this district, and the evidence presented at trial was insufficient to prove his intentional participation in the BSMI scheme. (Tr.[2] at 3372-75; Kris Lange 2/25 Mem., Doc. Entry No. 251.) Russell also moved for a judgment of acquittal, joining in Kris Lange's motion. (Tr. at 3372.) The Court deferred decision on the defendants' motions, pursuant to Rule 29(b), and submitted the charges to the jury. On March 6, 2014, the jury

---

[2] Citations to "Tr." refer to the transcript of the trial proceedings.

returned a verdict of guilty against both defendants on all applicable charges. Defendants subsequently renewed their motions for acquittal pursuant to Rule 29(c) and moved to set aside the verdict pursuant to Rule 33.

## DISCUSSION

### I. Legal Standard

#### A. Rule 29

Rule 29 of the Federal Rules of Criminal Procedure ("Rule 29") provides that "the court . . . must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29 (a). "If the court reserves decision [on a Rule 29 motion], it must decide the motion on the basis of the evidence at the time the ruling was reserved." Fed. R. Crim. P. 29(b). A defendant seeking to overturn a jury verdict on sufficiency grounds bears a "heavy burden." *United States v. Anderson*, 2014 WL 814889, at *6 (2d Cir. Mar. 4, 2014) (citing *United States v. Aguilar*, 585 F.3d 652, 656 (2d Cir. 2009)). The Court must "uphold the conviction if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," *id.*; *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), or, in the case of a challenge based on venue, by a preponderance of the evidence. *United States v. Davis*, 689 F.3d 179, 185 (2d Cir. 2012).

"When assessing a sufficiency challenge," the Court must "consider the evidence presented 'in its totality, not in isolation.'" *Anderson*, 2014 WL 814889, at *6 (quoting *United States v. Huezo*, 546 F.3d 174, 178 (2d Cir. 2008)). A Rule 29 motion "'does not provide the trial court . . . with an opportunity to substitute its own determination of the weight of the evidence and the reasonable inferences to be drawn for that of the jury.'" *Id.* (quoting *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999)). Rather, the Court must view the

evidence "in a light that is most favorable to the government, and with all reasonable inferences resolved in favor of the government." *United States v. Persico*, 645 F.3d 85, 104 (2d Cir. 2011) (quoting *United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008)). When there are "competing inferences that can be drawn from the evidence," the Court must "defer to the jury's choice," because "it is the task of the jury, not the court, to choose among competing inferences that can be drawn from the evidence." *Eppolito*, 543 F.3d at 45 (internal quotation marks omitted); *see also United States v. Desena*, 260 F.3d 150, 154 (2d Cir. 2001) (finding that the Court must resolve all issues of credibility in favor of the jury's verdict). A conviction may not, however, be "based on evidence that is at least as consistent with innocence as with guilt." *United States v. Mulheren*, 938 F.2d 364, 372 (2d Cir. 1991). Nor may a conviction stand if it was based on speculation and surmise alone. *United States v. Stringer*, 2012 WL 11269, at *4 (S.D.N.Y. Jan. 3, 2012) (citing *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994)), *aff'd*, 730 F.3d 120 (2d Cir. 2013).

## B. Rule 33

Rule 33 of the Federal Rules of Criminal Procedure ("Rule 33") provides that "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). The defendant bears the burden of proving that he is entitled to a new trial under Rule 33. *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009). "Rule 33 motions are granted only in extraordinary circumstances, and are committed to the trial court's discretion," *McCourty*, 562 F.3d at 475 (internal quotation marks omitted), which should be used "sparingly." *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992). "The ultimate test is whether letting a guilty verdict stand would be a manifest injustice." *United States v. Aguiar*,

737 F.3d 251, 264 (2d Cir. 2013). "To grant the motion, there must be a real concern that an innocent person may have been convicted." *Id.* (internal quotation marks omitted).

In deciding a Rule 33 motion, the Court "'must examine the entire case, take into account all facts and circumstances, and make an objective evaluation.'" *Aguiar*, 737 F.3d at 264 (quoting *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001). "[O]nly where exceptional circumstances can be demonstrated" may the Court "intrude upon the jury function of credibility assessment." *United States v. Sanchez*, 969 F.2d at 1414; *see also United States v. Bell*, 584 F.3d 478, 483 (2d Cir. 2009). "Where testimony is patently incredible or defies physical realities, it may be rejected by the court, despite the jury's evaluation." *Sanchez* 969 F.2d at 1414. However, the Court's "rejection of all or part of the testimony of a witness or witnesses does not automatically entitle a defendant to a new trial." *Id.* Instead, manifest injustice cannot be found unless the Court is not satisfied that "competent, satisfactory and sufficient evidence in this record supports the jury's finding that this defendant is guilty beyond a reasonable doubt." *Id.*

## II.    Venue

Both defendants move for a judgment of acquittal and, alternatively, a new trial on Counts Two and Three on the basis that the evidence presented at trial regarding the BSMI scheme was insufficient to establish venue in the Eastern District of New York ("EDNY"). (Kris Lange 4/16 Mem. at 1-2, Doc. Entry No. 290; Russell Mem. at 10-16; Doc. Entry No. 291-3.)

### A.    Venue Generally

Both the Sixth Amendment and Rule 18 of the Federal Rules of Criminal Procedure require that a defendant be tried in the district where his crime was "committed." *United States v. Tzolov*, 642 F.3d 314, 318 (2d Cir. 2011) (citing U.S. Const. amend. IV; Fed. R. Crim. P. 18;

U.S. Const. art. iii, § 2, cl. 3). Provisions implicating venue are to be narrowly construed. *United States v. Ramirez*, 420 F.3d 134, 146 (2d Cir. 2005). However, since venue is not an element of a crime, the government bears the burden of proving venue by a preponderance of the evidence. *Tzolov*, 642 F.3d at 318. Venue may be proven by circumstantial evidence, *United States v. Potamitis*, 739 F.2d 784, 791 (2d Cir. 1984); *United States v. Conteh*, 2 F. App'x 202, 203 (2d Cir. 2001) (summary order), and the sufficiency of the evidence is viewed in the light most favorable to the government. *Tzolov*, 642 F.3d at 318.

A separate analysis is required to determine whether venue has been established for Count Two, which charges the defendants with conspiracy to commit securities fraud and wire fraud, and for Count Three, which charges the defendants with substantive securities fraud. *See Ramirez*, 420 F.3d at 139 (quoting *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1188 (2d Cir. 1989)) (finding that, "[b]ecause 'venue must be proper with respect to each count,' we may conclude that venue was proper as to some counts but not as to others.") Accordingly, the Court considers whether the government has established venue for Counts Two and Three in turn.

### B. Count Two

With respect to Count Two, the conspiracy charge, venue is proper in any district in which an overt act in furtherance of the conspiracy was committed by any of the coconspirators. *United States v. Geibel*, 369 F.3d 682, 696 (2d Cir. 2004). "Thus, a defendant need not himself have ever been physically present in a district for a conspiracy charge against him to be venued there." *United States v. Rommy*, 506 F.3d 108, 120 (2d Cir. 2007). "An overt act is any act performed by any conspirator for the purpose of accomplishing the objectives of the conspiracy. The act need not be unlawful; it can be any act, innocent or illegal, as long as it is done in

furtherance of the object or purpose of the conspiracy." *Tzolov*, 642 F.3d 314, 320 (2d Cir. 2011) (citing Rommy, 506 F.3d at 119) (finding that defendants' use of John F. Kennedy ("JFK") Airport was an overt act sufficient to establish venue in the EDNY on a conspiracy charge). "This includes not just acts by co-conspirators but also acts that the conspirators caused others to take that materially furthered the ends of the conspiracy." *United States v. Royer*, 549 F.3d 886, 896 (2d Cir. 2008). "[T]he government is 'not restricted to the overt acts charged in the indictment in justifying its choice' of venue." *United States v. Nguyen*, 507 F. App'x 64, 67 (2d Cir. 2013) (quoting *United States v. Schwartz*, 535 F.2d 160, 165 (2d Cir. 1976)).

The government relies on two sets of acts as the basis for venue in Count Two. (Gov. Mem. at 33, Doc. Entry No. 292.) The evidence presented at trial as to each of these acts is summarized below.

### 1. Cold calls to potential BSMI investors

In May 2010, Bill Lange purchased a sales lead list (the "call list") in an attempt to solicit individual investors to invest in BSMI. (Tr. at 1621, 1623-28.) The call list included approximately 2,000 names, numbers, and addresses for people who lived throughout the United States. (Tr. at 1624-25; GX[3] 450.) Between thirty and forty people on the call list had an EDNY area code or address. (GX 450.) Addresses were not provided for some people on the call list. (*Id.*)

After BSMI received the call list, Russell "scrubbed" the list by indicating the individuals who should not be contacted by BSMI employees because they were on the National Do Not Call Registry ("DNC list"). (Tr. at 1631-32, 1643-46, 1863-64; GX 452.) On June 3, 2010, Russell sent a list containing a subset of the names on the call list (the "first scrubbed list") to

---

[3] References to "GX" refer to government exhibits.

Julia Day, Pascua, Perkins, and kris@black-sand-inc.com.[4]  (Tr. at 1632, 3226-28; GX 453.)

The first scrubbed list contained approximately seventy names.  (GX 453.)  Of these, fourteen

individuals were located within the EDNY.  (*Id.*)  Russell's email indicated that the scrubbed list

could be used to begin researching "email addresses, business names, etc."  (*Id.*)  On the same

day, Russell sent an email to Pascua, Perkins, and kris@black-sand-inc.com, attaching a second

scrubbed list (the "second scrubbed list").  (Tr. at 1643, 3229-30; GX 455.)  The second

scrubbed list contained approximately fifty names, including two individuals with a 718 area

code.  (*Id.*)  An address was not listed for either of these two individuals.  (*Id.*)

　　The government presented evidence at trial that BSMI employees made cold calls to

individuals on the call list to solicit investments in BSMI.  Pascua testified that "a few, three

four[, ] maybe five" BSMI employees called potential investors, including Bill Lange.  (Tr. at

1624-27.)  Shulmire testified that Russell gave BSMI employees lists of names that they were to

call and that the entire BSMI staff, including Kris Lange, made sales calls.  (Tr. at 2980, 3022,

3040; GX 374.)  Melissa Lange, Bill Lange's daughter, also was sent a list of individuals to cold

call, including one individual in the EDNY.  (Tr. at 1646-48; GX 464.)  In June 2010, Pascua

called Ronald Lieske ("Lieske"), an individual from Minnesota whose contact information was

on the call list.  (Tr. at 1640-41, 2333-34; GX 450.)  Pascua told Lieske about the opportunity to

invest with BSMI and sent Lieske additional information.  (Tr. at 2334-35.)  A few days later,

Bill Lange, posing as Kris Lange, called Lieske to further discuss the potential investment.  (*Id.*

at 2335-36.)  Lieske ultimately invested $50,000 in BSMI.  (*Id.* at 2381-82, 2388-91.)

　　The government contends that the evidence is sufficient to prove by a preponderance of

the evidence that BSMI conspirators used the call list to solicit investors in this district.  (Gov.

---

[4] The government presented evidence at trial that the kris@black-sand-inc.com email address was used by both
Kris and Bill Lange.  (Tr. at 1630, 1646, 3028-29, 3041.)

Mem. at 34.) Defendants argue that the government has failed to present evidence that anyone in this District was actually called. (Russell Mem. at 12-13; Kris Lange 2/25 Mem. at 3; Kris Lange 4/16 Mem. at 2; Russell Reply at 1.) The Court finds that the evidence presented at trial regarding BSMI's practice of cold calling potential investors, when viewed in the light most favorable to the government, is sufficient to establish to establish venue for Count Two.

Although defendants are correct that the government did not present direct evidence that a BSMI coconspirator called anyone in this district, venue may be proven by circumstantial evidence. *Potamitis*, 739 F.2d at 791; *see also Royer*, 549 F.3d at 894 ("Although no direct evidence of . . . trades [by investors within the venue district] was presented to the jury, that is of no moment to our analysis.") The government presented evidence that the call list, as well as the scrubbed lists, contained names of people residing within this district, and that BSMI employees, including Bill Lange, Kris Lange, and Pascua, solicited investors by calling people whose names appeared on the lists. Based on this evidence and the record as a whole, a rational trier of fact could have found by a preponderance of the evidence that persons living within the EDNY were targeted by the defendants and their coconspirators as potential victims and that a BSMI coconspirator called a potential investor in the EDNY. As such, an overt act was committed in furtherance of the conspiracy in this district. Such an inference, while not required, could not fairly be said to be based on speculation and surmise alone. *See D'Amato*, 39 F.3d at 1256.

Accordingly, a judgment of acquittal under Rule 29 on the basis that the government failed to establish venue for Count Two is not warranted. For the same reasons, the jury's finding that venue was established for Count Two does not constitute manifest injustice warranting a new trial under Rule 33. Moreover, as discussed immediately below, this was not

the only evidence regarding venue in EDNY as to Count Two that was presented by the government.

## 2. Emails with Postal Inspector Lucente

Starting on November 29, 2010, Postal Inspector Kenneth Lucente exchanged emails with info@black-sand-inc.com under the guise of a potential investor named Anthony Hill. (Tr. at 3245-47; GX 479.) Inspector Lucente exchanged these emails with BSMI from his office within the EDNY. (Tr. at 3245.) On December 3, 2010, Pascua's wife JoEll sent an email to Inspector Lucente, thanking him for his interest in BSMI and attaching a newsletter containing information about BSMI's purported mining operation. (Tr. at 2004, 3259-62, 3367; GX 480.) The newsletter contained several material misrepresentations, including statements that: 1) BSMI had a mining operation on Sitkinak Island; 2) BSMI was positioned to produce profitable results; 3) gave a false address for BSMI; and 4) gave a misleading impression of BSMI's "discount purchase program." (GX 480.) At the time JoEll forwarded the newsletter to Inspector Lucente, she was being paid by BSMI. (GX 506-D.) On December 5, 2010, Pascua sent an email to Inspector Lucente, in which Pascua stated that "the opportunity may be limited with BSMI," citing BSMI's need to work with accredited investors with whom BSMI had a preexisting relationship. (Tr. at 2007-08; KL-92.) At trial, Pascua claimed that his email "didn't close the door completely" on a deal with Inspector Lucente. (Tr. at 2010.)

The government contends that the evidence of emails from JoEll and Joseph Pascua to Inspector Lucente is sufficient to establish venue for Count Two. The Court first considers the December 3, 2010 email from JoEll to Inspector Lucente. It is undisputed that JoEll was not a coconspirator in the BSMI scheme. The government argues, however, that Pascua and Kris Lange "caused an act in furtherance of the charged offense to occur in the district of venue by

11

entrusting JoEll Pascua to deal with potential investors and providing her with the materials containing misrepresentations that she sent to Anthony Hill." (Gov. 2/25/14 Mem. at 4, Doc. Entry No. 250.) Although the government did not present direct evidence showing that JoEll was entrusted to deal with potential investors, a rational trier of fact could conclude from the circumstantial evidence presented that Pascua caused JoEll to take actions that materially furthered the ends of the conspiracy. *See Royer*, 549 F.3d at 896. Indeed, the fact that JoEll forwarded the newsletter to Inspector Lucente shows that she had been given access to the newsletter and understood that it was intended for potential investors. Moreover, JoEll's email materially furthered the ends of the conspiracy by providing information about the BSMI investment opportunity to Inspector Lucente, a potential investor. (*See* GX 480.) Accordingly, a rational trier of fact properly could conclude that a BSMI coconspirator caused JoEll to act in furtherance of the BSMI scheme. As such, JoEll's email to Inspector Lucente is an additional overt act supporting venue in this district.

Pascua's email to Inspector Lucente also may serve as the basis for venue in this district because it is an overt act taken in furtherance of the conspiracy. Defendants argue that Pascua did not make an offer in his December 5, 2010 email to Inspector Lucente, and, therefore, the email was not sent in furtherance of the conspiracy. (Kris Lange 2/25 Mem. at 2-3; Kris Lange 4/16 Mem. at 2; Russell Mem. at 13-14.) The Court is not persuaded by the defendants' argument. As an initial matter, Pascua's email need not necessarily have been an offer to sell stock to be considered an overt act in furtherance of the conspiracy. Instead, it must have been performed "for the purpose of accomplishing the objectives of the conspiracy." *Tzolov*, 642 F.3d at 320.

Although Pascua indicated in the email that no investment opportunity was available, the evidence presented at trial shows that such statements, which were intended to create a false sense of scarcity and urgency, were consistent with the sales tactics of members of the BSMI conspiracy. For example, government witness Robert Stout ("Stout") testified that, while on a moose hunting trip with Bill Lange, Bill Lange told Stout that he would have to talk to his partner before offering Stout an opportunity to invest in BSMI. (Tr. at 1799.) Additionally, although BSMI promotional materials offered a "discount purchase program" to the first one hundred investors, the program was not actually limited to the first investors, and was instituted "[t]o create a sense of urgency to get investors to act." (Tr. at 1599.) Moreover, Pascua testified that his email to Inspector Lucente did not "close the door completely" on a sale. (Tr. at 2010.) Based on this evidence and the record as a whole, the evidence was sufficient for the jury to find that Pascua had committed an overt act in furtherance of the conspiracy within this district.

Accordingly, based on the cold calls to potential investors as well as both emails to Inspector Lucente, the Court finds that the evidence was sufficient to establish venue as to Count Two and no manifest injustice exists. Therefore, defendants' Rule 29 and Rule 33 motions as to venue for Count Two are denied.

###    C.    Count Three

With respect to Count Three, the substantive securities fraud charge, venue is proper "in the district wherein any act or transaction constituting the violation occurred." 15 U.S.C. § 78aa. The Second Circuit Court of Appeals has held that, in a case charging substantive securities fraud, "venue is proper in a district where (1) the defendant intentionally or knowingly causes an act in furtherance of the charged offense to occur in the district of venue or (2) it is foreseeable that such an act would occur in the district of venue [and it does]." *Royer*, 549 F.3d at 894

(quoting *United States v. Svoboda*, 347 F.3d 471, 483 (2d Cir. 2003) (finding that venue in the Southern District of New York ("SDNY") was established on a substantive securities fraud charge where it was reasonably foreseeable that trades made by the defendant using inside information would be executed in the SDNY). "Venue is not proper in a district in which the only acts performed by the defendant were preparatory to the offense and not part of the offense." *Beech-Nut*, 871 F.2d at 1190 (finding that placing phone calls to order adulterated apple juice was insufficient to satisfy the venue requirement for the charged crime of introducing the juice into commerce); *see also Tzolov*, 642 F.3d at 319 (finding that the defendants' flight out of JFK airport was insufficient to satisfy the venue requirement for a substantive securities fraud charge). However, "where the liability of the substantive offense is premised on an aiding and abetting theory, as in this case, venue is proper where the defendant's accessorial acts were committed or where the underlying crime occurred." *United States v. Whittingham*, 346 F. App'x 683, 685-86 (2d Cir. 2009) (internal quotation marks omitted) (citing *United States v. Smith*, 198 F.3d 377, 383 (2d Cir. 1999)).

To establish venue for Count Three, the government relies on the same two sets of acts discussed above in connection with Count Two, namely cold calls to potential investors and emails to Inspector Lucente. (Gov. Mem. at 33, Doc. Entry No. 292.)

### 1. Cold calls to potential BSMI investors

As discussed above (*see* discussion, *supra*, part II. B. 1), the Court concluded that a reasonable trier of fact could find, by a preponderance of the evidence, that a BSMI coconspirator called a potential investor in the EDNY, and, thereby, committed an overt act in furtherance of the conspiracy in this district. However, Count Three charges the defendants with substantive securities fraud, rather than with conspiring to commit a crime. To establish venue

as to Count Three, therefore, it is not sufficient for the government to show that any BSMI coconspirator committed an overt act in this district. *Royer*, 549 F.3d at 894 (finding that venue is appropriate where "*the defendant* intentionally or knowingly causes and act . . . to occur . . . or it is foreseeable that such an act would occur . . ."). Rather, the Court must consider each defendant's conduct.

With respect to defendant Russell, the Court finds that venue in this district is proper by virtue of Russell's aiding and abetting of the substantive securities fraud. The evidence presented at trial clearly established Russell's role in "scrubbing" the call list and distributing culled lists. (Tr. at 1631-32, 1643-46, 1863-64, 2980, 3226-30; GX 452, 453, 455.) Since those who aid and abet a crime are punishable as a principal, 18 U.S.C.A. § 2, these acts are sufficient to establish that Russell "caused an act in furtherance of the charged offense to occur in the district of venue." *United States v. Royer*, 549 F.3d at 894. At the very least, it would have been foreseeable to Russell that a BSMI employee would call a potential investor in this district, since the call list provided many phone numbers with EDNY area codes. Further, as discussed above, a rational trier of fact could find by a preponderance of the evidence that someone within this district in fact was called by a BSMI coconspirator.

With respect to Kris Lange, however, the Court finds that the record is insufficient to establish venue on Count Three on the basis of cold calls to potential investors. While a rational trier of fact could find that at least one of the BSMI coconspirators called a potential investor within this district, the evidence is simply too tenuous to establish by a preponderance of the evidence that Kris Lange himself called anyone within this district. By contrast, the evidence presented at trial shows that Bill Lange aggressively solicited investors. (Tr. at 1652-1653,

1656; GX 465, 475.)  Nor has the government presented evidence that Kris Lange aided and abetted phone calls to this district by other BSMI employees.

### 2.  *Emails with Postal Inspector Lucente*

JoEll's email to Inspector Lucente constitutes the charged crime of securities fraud, because the newsletter provided material misrepresentations for the purpose of persuading individuals to invest in BSMI.  (*See* discussion, *supra*, II. B. 2; GX 480.)  This act cannot fairly be considered merely "preparatory" in light of relevant Second Circuit precedent.  Notably, in *Tzolov*, boarding a flight at JFK airport was considered merely preparatory to the substantive securities fraud charge.  642 F.3d at 319.  In *Beech-Nut*, placing a phone call into the venue district to order adulterated apple juice was preparatory to the charged crime of introducing the juice into commerce.  871 F.3d at 1190.  A rational trier of fact could find that Russell aided and abetted JoEll's dissemination of material misrepresentations by:  1) setting up BSMI employees' email addresses, (Tr. at 2980); and 2) assisting with production of the newsletter.  (Tr. at 1609-12, 1979; GX 438, 459.)

Russell contends that the government cannot establish venue based on JoEll's email, because he left BSMI before she sent the newsletter to Inspector Lucente.  (Russell Mem. at 14; Russell Reply at 2; GX 506-C.)  However, Russell was instrumental in creating the newsletter for the explicit purpose of soliciting investors, and he has not shown that he withdrew from the conspiracy by taking affirmative steps to terminate his participation in the conspiracy.  *See United States v. Flaharty*, 295 F.3d 182, 192 (2d Cir. 2002).  Accordingly, since Russell's actions aided in the dissemination of materially false information, it is irrelevant whether these actions occurred before JoEll's email was sent.

The government failed, however, to present evidence at trial of Kris Lange's involvement in creating the newsletter or otherwise disseminating materially false information in this district. Accordingly, the Court finds that the evidence is sufficient to support venue on Count Three as to Russell, but not as to Kris Lange. Accordingly, Kris Lange's Rule 29 motion for acquittal is granted as to Count Three.

### D. Substantial Contacts

"[V]enue must not only involve some activity in the situs district but also satisfy the 'substantial contacts' test of [*United States v. Reed*, 773 F.2d 477, 481 (2d Cir. 1985)]." *Royer*, 549 F.3d at 895. The *Reed* test "requires consideration of such factors as 'the site of the defendant's acts, the elements and nature of the crime, the locus of the effect of the criminal conduct, and the suitability of the [venue] for accurate factfinding." *Id.* The *Reed* test is not "a formal constitutional test," but instead is used as a guide "in determining whether a chosen venue is unfair or prejudicial to a defendant." *United States v. Saavedra*, 223 F.3d 85, 93 (2d Cir. 2000); *see also United States v. Abdallah*, 528 F. App'x 79, 83 (2d Cir. 2013) (summary order) (noting that "the factors listed in *Reed* are useful guideposts for consideration, [but] they are not mandatory or 'mechanical' specifications for a valid venue.")

In this case, substantial contacts exist that make venue in the EDNY proper. Although formation of the HGFI and BSMI conspiracies, as well as much of the illegal conduct, took place in Washington State, the "elements and nature of the crime" create a "nexus" between the site of the defendant's acts and this district. *See Saavedra*, 223 F.3d at 93. Both schemes relied heavily on the use of the internet for targeting victims as well as executing the schemes, which were far-reaching and targeted victims throughout the country. *See Royer*, 549 F.3d at 895 (finding that, where the defendants defrauded investors throughout the country, they "can hardly complain that

17

their very modus operandi subjected them to prosecution in numerous districts, including the Eastern District of New York"); *Abdallah*, 528 F. App'x at 83 ("Where, as here, the site of the defendant's acts are multiple and wide-ranging, several districts may be appropriate for trial, and there is no requirement that the district selected have more factors weigh in its favor than the others.") (internal citations and quotations marks omitted). With respect to the HFGI scheme, one of the victims, Captain Eric Bernard, was located in Brooklyn, as was HFGI's escrow attorney, Michael Garber. (Tr. at 2301, 2304-05, 2307, 2311, 2316, 2505, 2849, 2927, 3186; GX 91.) With respect to the BSMI scheme, the Court found that the evidence is sufficient to show that BSMI coconspirators targeted potential investors in this district, and JoEll and Joseph Pascua communicated with Inspector Lucente from his office within this district. (Tr. at 3245.) For the same reasons, the effect of the defendants' criminal conduct was felt in the EDNY. With respect to this district's suitability for accurate factfinding, while Washington State may have been a more convenient site for trial, the Court finds no reason to suspect that factfinding was unduly hindered by virtue of the trial taking place in the EDNY. Similarly, although it may have been somewhat of a hardship for the defendants to be tried in this district, the Court finds, based on consideration of the *Reed* factors, that the location of the trial was not unduly prejudicial. Accordingly, the Court finds that substantial contacts exist making this district an appropriate venue for trial.

In sum, based on the foregoing, Russell's Rule 29 and Rule 33 motions as to Count Three on the basis of improper venue are denied, and Kris Lange's Rule 29 motion for acquittal as to Count Three based on improper venue and lack of sufficient evidence is granted.

**III.     Proof of Knowledge and Intent**

**A.     Russell**

Russell contends that the government failed to present sufficient proof of his knowledge and intent with respect to all three charges. (Russell Mem. at 2-9.) For the reasons stated below, the Court finds Russell's motion to be without merit.

With respect to the HFGI scheme, Russell contends that the evidence was insufficient because, *inter alia*: 1) although Russell was a diligent worker, he was low-level employee without significant access or authority; 2) Russell was not paid a large salary; 3) Russell did not communicate directly with many of HFGI's investors, and those who knew him identified him as a loan processor; and 4) although Pascua testified that Russell was directly informed of the conspiracy, Pascua's testimony not credible.[5] (Russell Mem. at 6-8; Tr. at 3675-3712.)

However, Russell's enumeration of potential weaknesses in the government's case does little to show that no rational trier of fact could have found, beyond a reasonable doubt, that Russell had the requisite knowledge and intent to find him guilty of conspiracy to commit wire fraud in connection with the HFGI scheme. *Anderson*, 2014 WL 814889, at *6. The government presented ample evidence upon which the jury could conclude, beyond a reasonable doubt, that Russell knowingly participated in the HFGI conspiracy. At trial, the government introduced evidence showing that Russell's employment at HFGI and other companies owned by Bill Lange made him aware of HFGI's lack of funding. (Tr. at 2807-08; 2899-901.) Shulmire testified that HFGI received "constant calls, complaints from developers and the individuals asking about the funding from their loans," and that the entire staff, including Russell, knew

---

[5] To the extent that Russell argues that the Court should discount Pascua's testimony (Russell Mem. at 8), the Court finds that Pascua's testimony was credible, and, in any event, it was largely corroborated by other testimony and by documentary evidence. Moreover, as already discussed in section I. A. above, the Court must view the evidence in the light most favorable to the government and the jury's credibility determinations must be accorded great deference.

about these calls. (Tr. at 2876-77, 2901, 2928-29, 2932-33.) At Bill Lange's request, Russell disconnected the telephone lines for HGFI and one of Bill Lange's predecessor companies after clients called to complain about not receiving payments. (Tr. at 2782, 2790, 2822, 2952, 2966, 3060-61.)

Moreover, as a member of HFGI's *de facto* board, Russell was privy to information not shared with regular HFGI employees, including information about HFGI's efforts to obtain funding. (Tr. at 777-78, 1167-68, 2797-98; GX 92.) Russell attended meetings regarding HFGI's unsuccessful attempt to obtain funding by leasing a bank instrument. (Tr. at 1163-66, 1168, 1711.) Russell also was aware that clients' deposits were not held in escrow, and that HFGI used deposit money to try to obtain a bank instrument. (Tr. at 1229-1231, 1238, 2833, 2835-39, 2846-47, 2854, 2856, 2858, 2924, 2956; GX 103, 111, 124.)

Despite this knowledge, Russell falsely represented to clients that HGFI had money to lend and that clients' deposits would be returned if HFGI did not fund their projects. (GX 32-8, 35-8.) Specifically, Russell was responsible for preparing and maintaining loan agreements and escrow agreements containing false and misleading information. (Tr. at 2816, 2826-28, 2846, 2854, 2864-68, 2892; GX 89, 120.) Based on this evidence, and the extensive amount of additional evidence presented at trial, including numerous email communications between Russell and his coconspirators, a rational trier of fact easily could conclude that Russell participated in the HFGI conspiracy with knowledge of its unlawful purpose and with the specific intention of furthering its objectives. Accordingly, Russell's motion is denied as to Count One.

With respect to the BSMI scheme, Russell makes similar arguments, including that: 1) Russell was a low-level employee of BSMI who earned an insubstantial salary; 2) Russell lacked

"mining experience or metallurgical knowledge"; 3) his tasks were largely limited to the formatting of promotional materials, rather than contributing to their content; 4) the information in the promotional materials was largely true; 5) it was not proven that Russell knew of any untruths or that they were material; 6) Russell did not communicate with potential investors directly; and 7) Pascua believed that his BSMI solicitations were objective, so it cannot be expected that Russell would know otherwise.  (Russell Mem. at 8-9.)

Russell's argument in connection with the BSMI scheme suffers from the same defects as his argument regarding the HFGI scheme.  Russell attempts to relitigate the issue of his knowledge and intent by pointing out weaknesses in the government's case, but this does not negate the plethora of evidence upon which the jury could have based its verdict.  At trial, the government introduced evidence that Russell was aware of the demise of HFGI and that BSMI was formed at a time when Bill Lange's companies were in debt.  (Tr. at 2974-75.)  As noted above, Russell was aware that HFGI failed to obtain funding by leasing a bank instrument, and Shulmire testified that the company received "constant" complaints from clients.  Despite Russell's awareness of BSMI's lack of funding, he helped prepare promotional materials that falsely represented BSMI's ability to raise money.  (Tr. at 2900-02, 2965-66, 3038-39; GX 389.)

Shulmire also testified that Russell was aware that Bill Lange used Kris Lange's name to make sales calls because of Bill Lange's "bad publicity on the internet."  (Tr. 2977-79.)  Moreover, Russell helped prepare materials that conspicuously omitted information about Bill Lange's involvement with BSMI and about other BSMI employees' connection to HFGI.  (Tr. at 1376-77, 2977-78, 2984-90, 2998-3017.)  This omission was significant because it prevented investors from finding out about Bill Lange's and other coconspirator's involvement in the HFGI fraud scheme and its predecessor fraud schemes.  Based on this evidence and the record as a

whole, a rational trier of fact could conclude, beyond a reasonable doubt, that Russell knowingly participated in the BSMI scheme.

Russell's arguments also fail because "[t]he size of a defendant's role does not determine whether that person may be convicted of conspiracy charges. Rather, what is important is whether the defendant willfully participated in the activities of the conspiracy with knowledge of its illegal ends." *United States v. Vanwort*, 887 F.2d 375, 386 (2d Cir. 1989). Thus, it is irrelevant whether Russell was a minor player in the HFGI and BSMI schemes. Additionally, whether Russell benefited financially from his participation in the scheme is of limited relevance. *See United States v. Heredia*, 2003 WL 21524008, at *4 (S.D.N.Y. July 3, 2003) (a defendant's culpability for his alleged participation in a conspiracy is not negated because he incurred a financial loss in the end).

Accordingly, Russell's motion is denied as to all three Counts.

**B.     Kris Lange**

Kris Lange also contends, without elaborating, that the proof of his intentional participation in the BSMI scheme is insufficient. (Kris Lange 2/25 Mem. at 4; Kris Lange 4/16 Mem. at 2; Tr. at 3375.) The Court finds that the evidence introduced at trial is sufficient to support a finding that Kris Lange intentionally participated in the BSMI conspiracy. For example, Kris Lange helped create and edit his resume, which contained materially misleading information about his experience, for inclusion in BSMI's promotional materials. (Tr. at 3324, 3344-48; GX 9.) Kris Lange also participated in calls with potential investors in which his father, Bill Lange, posed as Kris for the purpose of concealing his involvement with BSMI. (Tr. at 3325, 3335-36; GX 9.) Based on this evidence, and the record as a whole, a rational trier of

fact could find beyond a reasonable doubt that Kris Lange intended to defraud investors in BSMI.

Accordingly, Kris Lange's motion as to Count Two is denied.

## IV. Jury Charges

Russell argues that a new trial is warranted under Rule 33 because the Court erred in including conscious avoidance and "no ultimate harm" charges in its instructions to the jury. (Russell Mem. at 16.) The government contends that there was a factual predicate for both charges. (Gov. Mem. at 40-47.)

### A. Conscious Avoidance Charge

Over objection, the Court instructed the jury that it could find a defendant to have acted knowingly if he "deliberately closed his eyes to what otherwise would have been obvious to him." (Final Jury Charge at 28, Doc. Entry No. 269.) Russell contends that there was no factual predicate for submitting this conscious avoidance charge, and that a new trial is warranted on this basis. (Russell Mem. at 16-19, 20-23.)

"A conscious avoidance instruction permits a jury to find that a defendant had culpable knowledge of a fact when the evidence shows that the defendant intentionally avoided confirming that fact." *United States v. Ferrarini*, 219 F.3d 145, 154 (2d Cir. 2000). Such an instruction "may only be given if (1) the defendant asserts the lack of some specific aspect of knowledge required for conviction and (2) the appropriate factual predicate for the charge exists, i.e., the evidence is such that a rational juror may reach the conclusion beyond a reasonable doubt that the defendant was aware of a high probability of a fact in dispute and consciously avoided confirming that fact." *Id.* (internal citations and quotations omitted). In other words, for an appropriate factual predicate to exist, there must be evidence in the record that the defendant

deliberately avoided learning the truth. *Id.* Evidence of actual knowledge of a fraud is not necessarily sufficient to establish conscious avoidance. *United States v. Kaplan*, 490 F.3d 110, 127 (2d Cir. 2007) (citing *Ferrarini*, 219 F.3d at 157).

However, a conscious avoidance instruction may be appropriate "even when the government attempts to prove actual knowledge," *United States v. Adelson*, 237 F. App'x 713, 715 (2d Cir. 2007), and the same evidence may be used to infer conscious avoidance and actual knowledge. *United States v. Kozeny*, 667 F.3d 122, 133 (2d Cir. 2011) (citing *Svoboda*, 347 F.3d at 480). Moreover, a factual predicate for a conscious avoidance charge "may be established where a defendant's involvement in the criminal offense may have been so overwhelmingly suspicious that the defendant's failure to question the suspicious circumstances establishes the defendant's purposeful contrivance to avoid guilty knowledge." *Svoboda*, 347 F.3d at 480 (internal quotation marks omitted). Even if there is no factual predicate, "an unwarranted conscious avoidance instruction is harmless error where there is 'overwhelming evidence' of actual knowledge. *Kaplan*, 490 F.3d at 128; *United States v. Aina-Marshall*, 336 F.3d 167, 171 (2d Cir. 2003).

Russell argues that a conscious avoidance charge was inappropriate in this case because there was direct evidence in the case that Russell had actual knowledge of the goals of the HFGI and BSMI conspiracies. (Russell Mem. at 22.) It should be noted that this argument contradicts Russell's claim, discussed in section II. A., *supra*, that the government did not provide sufficient proof of knowledge and intent. As discussed above, with respect to the HFGI scheme, the government introduced ample testimony regarding Russell's knowledge and intent, including evidence showing that Russell was aware of HFGI's ultimately unsuccessful attempt to obtain funding by leasing a bank instrument; that clients' deposits were not maintained in escrow; and

that HFGI used deposit money to try to obtain a bank instrument.  As to the BSMI scheme, evidence was presented at trial showing that Russell knew of the company's lack of funding and attempts to hide its connection to HFGI.  According to Russell, the evidence contained direct proof that Russell knew of the goals of the conspiracies and furthered them, but there was "a complete absence of evidence that Mr. Russell made affirmative efforts not to learn of the fraudulent goals."  (Russell Mem. at 23.)

As the government points out, the jury could have concluded based on the evidence Russell cites either that Russell actually knew of the charged conspiracies, or that he "'strongly suspected, but was not completely certain' that a fraud was being perpetrated."  (Gov. Mem. at 41 (citing *United States v. Nektalov*, 461 F.3d 309, 317 (2d Cir. 2006)).  Notably, a rational trier of fact could find that it would have appeared highly suspicious to Russell that HFGI and BSMI continued to accept deposits and investments from clients despite the companies' dire financial straits, and that any lack of actual knowledge on Russell's part was due to a conscious effort to avoid confirming an otherwise obvious fact.  Moreover, to the extent that a conscious avoidance instruction was not warranted, it was harmless error in light of the overwhelming evidence of Russell's actual knowledge of the charged frauds.  *See Kaplan*, 490 F.3d at 128.

### B.    No ultimate harm Charge

The Court also instructed the jury that

> a belief by the defendant, if such a belief existed, that ultimately everything would work out so that no one would lose any money does not require you to find that the defendant acted in good faith. No amount of honest belief on the part of the defendant that the scheme would, for example, ultimately make a profit for investors, will excuse fraudulent actions or false representations caused by him.

(Jury Charge at 40, 56.)  Russell argues that this instruction was inapplicable because Russell contended that he made no false or misleading statements to HFGI clients or BSMI investors.

(Russell Mem. at 23.)  Russell contends that, by giving the no ultimate harm charge, the Court "suggested to the jury that Mr. Russell had made misrepresentations . . .  and that these misrepresentations should not be ignored just because he thought everything would work out . . . ."  (*Id.* at 24.)

A no ultimate harm charge is proper where:  (1) there is a sufficient factual predicate to necessitate the instruction; (2) the instruction clearly requires that in order to convict, the jury must find that defendant had entered into the scheme with the intent to defraud; and (3) there was no evidence that the instruction caused the jury to be confused about the issue of intent.  *United States v. Cartelli*, 272 F. App'x 66, 69 (2d Cir. 2008) (summary order) (citing *United States v. Berkovich*, 168 F.3d 64, 67 (2d Cir. 1999)); *see also United States v. Leonard*, 529 F.3d 83, 92 (2d Cir. 2008).

Both defendants argued at trial that they believed no one would be harmed as a result of the HFGI and BSMI schemes.  The question of whether ultimately there would be financial harm to investors was squarely put to the jury by the defendants themselves.  Russell cannot now be heard to complain that the Court instructed the jury regarding defendants' no ultimate harm defense under these circumstances.  The Court finds that there was a factual predicate for the no ultimate harm charge in light of:  1) evidence of misrepresentations either made or aided and abetted by Russell (*see, e.g.*, discussion, *supra*, part II. C. 1), and 2) both defendants' arguments that they believed that HFGI and BSMI ultimately would be financially successful.  (*See* Tr. at 1710-11, 1860-61, 2080-83, 2107-25, 3681, 3705-06, 3724, 3731.)  Additionally, the jury charge as a whole made it quite clear that, to convict, the jury had to find, beyond a reasonable doubt, that each defendant entered into the scheme with the intent to defraud.  Russell does not argue

that the Court's instruction regarding intent was unclear or that the jury was confused as to this issue, nor does the Court find any evidence of confusion about the issue of intent.

Accordingly, no manifest injustice exists based on the Court's instructions to the jury, and, therefore, Russell's motion for a new trial on this basis is denied.

## CONCLUSION

For the reasons set forth above, Russell's Rule 29 and Rule 33 motions are denied in their entirety. Kris Lange's Rule 29 and Rule 33 motions are denied as to Count Two. As to Count Three, Kris Lange's Rule 29 motion is granted and his Rule 33 motion is denied as moot.

SO ORDERED.

Dated: Brooklyn, New York
      June 5, 2014

_____
/s/
DORA L. IRIZARRY
United States District Judge
